**MARLIN & SALTZMAN, LLP**
Stanley D. Saltzman (SBN 90058)
ssaltzman@marlinsaltzman.com
Tatiana G. Avakian (SBN 298970)
tavakian@marlinsaltzman.com
29800 Agoura Road, Suite 210
Agoura Hills, California 91301
Telephone: (818) 991-8080
Facsimile:  (818) 991-8081

**TOJARIEH LAW FIRM, PC**
Joseph Tojarieh, Esq. (SBN 265492)
jft@tojariehlaw.com
10250 Constellation Boulevard, Suite 100
Los Angeles, California 90067
Telephone:   (310) 553-5533
Facsimile:    (310) 553-5536

*Attorneys for Plaintiff Bryant Patton, individually and on behalf of all others similarly situated*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYANT PATTON, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MIDWEST CONSTRUCTION SERVICES, INC. dba TRILLIUM CONSTRUCTION/DRIVERS, a California corporation; and DOES 1 through 100, inclusive,<br><br>Defendant. | Case No. 2:19-cv-08580-JFW-MAA<br><br>[Removal from Superior Court of California, County of Los Angeles, Case No. 19STCV28353]<br><br><u>CLASS ACTION</u><br><br>[Assigned for all purposes to the Hon. John F. Walter, Courtroom 7A]<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing Date:      April 12, 2021<br>Time:                   1:30 p.m.<br>Courtroom:          7A<br><br>Date Action Filed:  August 14, 2019<br>Trial Date:            None Set |

**<u>TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:</u>**

**PLEASE TAKE NOTICE** that on Monday, April 12, 2021, at 1:30 p.m. or soon thereafter as may be heard in Courtroom 7A in United States District Court for the Central District of California, located at 350 W. 1st Street, Los Angeles, CA 90012, Plaintiff Bryant Patton ("Plaintiff"), individually and on behalf of all others similarly situated, will and hereby does move for an order remanding this action to the Superior Court of the State of California, County of Los Angeles.

This Motion is brought pursuant to 28 U.S.C. § 1447, as the Court does not have subject matter jurisdiction over this case. Defendant Midwest Construction Services, Inc. dba Trillium Construction/Drivers ("Defendant") removed this action from state court pursuant to the Class Action Fairness Act of 2005, codified at 28 U.S.C. § 1332(d) ("CAFA"). This Court lacks subject matter jurisdiction under CAFA because Defendant has failed to prove by a preponderance of the evidence that the total amount in controversy exceeds the sum of $5,000,000.00, as required by CAFA. Consequently, Plaintiff seeks a remand to the Superior Court of the State of California, County of Los Angeles, where this case was originally filed and where it rightfully belongs.

Plaintiff's Motion is based on this Notice, the Memorandum of Points and Authorities, the Declaration of Tatiana G. Avakian submitted herewith, the Declaration of Candice L. Rosevear, the pleadings, papers and records on file in this case, all matters of which this Court may take judicial notice, and such other documents and any oral argument or other matter that may be considered by the Court.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on October 17, 2019, October 30, 2019, and February 24, 2021.[1] Pursuant to paragraph 5 of the Court's Standing Order, Plaintiff filed a Joint

---

[1] Following the Parties' October 30, 2019 L.R. 7-3 conference, the Parties discussed scheduling private mediation and stipulated to staying this action,

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND

Meet and Confer Statement with respect to the Parties' meet and confer efforts. (Dkt. 33).

**PLEASE TAKE FURTHER NOTICE** that important information concerning the Court's conduct of hearing during the Covid-19 Pandemic may be found at https://www.cacd.uscourts.gov/honorable-john-f-walter.

Dated: March 12, 2021
                                        **MARLIN & SALTZMAN, LLP**
                                        **TOJARIEH LAW FIRM, PC**


                                        By:  /s/ Tatiana G. Avakian
                                               Stanley D. Saltzman, Esq.
                                               Tatiana G. Avakian, Esq.
                                               Attorneys for Plaintiff and the
                                               putative Class

---

pending the Ninth Circuit's decision in *Intl Brotherhood of Teamsters, et al. v. FMCSA*, Case Number 18-73488; *IBT, et al. v. FMCSA*, Case Number 19-70323; *Labor Commissioner State of CA v. FMCSA*, Case Number 19-70329; *Duy Ly, et al. v. FMCSA*, Case Number 19-70413. (Dkt. 29). On December 16, 2019, this Court stayed this action until 30 days after the Ninth Circuit's decision, with the exception of Plaintiff filing an amended complaint, and the Parties attending private mediation. (Dkt. 30). The Parties attended mediation on May 27, 2020 with Francis "Tripper" Ortman, but the Parties were unable to reach a resolution. (Dkt. 32). The stay in this action was lifted on February 16, 2021. Prior to, and following the lifting of the stay, the Parties continued to meet and confer regarding this Motion, including the Parties' L.R. 7-3 conference on February 24, 2021. (Avakian Decl., ¶ 7).

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................. 1

II.     STATEMENT OF FACTS .................................................... 3

    A.   Plaintiff's Complaint and Defendant's Notice of Removal ....................... 3

    B.   The Parties' Meet and Confer Discussions Prior to the Stay ................... 3

    C.   Plaintiff's First Amended Complaint ................................................ 4

    D.   The Parties' Meet and Confer Discussions After the Stay ...................... 4

III.    LEGAL STANDARD ........................................................... 4

IV.     ARGUMENT ...................................................................... 6

    A.   The Sturgeon Declarations Are Not "Competent Evidence" ..................... 6

        1.   Sturgeon Lacks the Qualifications to Conduct Samples. ...................... 7

        2.   The "Random Sample" Is Tainted with Statistical Errors. ..................... 8

            (a)   The Sample Size Is Too Small for Extrapolation ............... 9

            (b)   The Sample Is Not "Random" ...................................... 9

            (c)   The Sample Lacks Independence ................................. 10

            (d)   The Sample Lacks a Confidence Level or Margin of Error ..................................................... 11

        3.   The Data in the Sturgeon Declarations Is Contradictory. ..................... 12

    B.   Defendant's Unreliable Evidence Fails to Support a Reasonable Chain of Inferences for its Assumed 100% Violation Rate ..................................................................... 12

        1.   A 100% Violation Rate for Plaintiff's Meal and Rest Period Claims Is Purely Speculative. ............................. 13

        2.   Defendant Provides No Evidence to Support its 100% Violation Rate for the Unpaid Wages Claims. .................. 16

        3.   Defendant's Calculation of Waiting Time Penalties Is Inflated and Unsupported by Competent Evidence. .............. 18

        4.   Defendant's Calculations for the Inaccurate Wage

iv

Statement Claim Are Likewise Speculative.....................................20

C.   Defendant's Unreliable Evidence Fails to Support a
     Reasonable Chain of Inferences for a 25% Violation Rate .....................21

D.   Defendant's Calculation of Attorneys' Fees at 25% Is
     Unsupported .........................................................................................22

E.   Alternatively, Should the Court Accept a 25% Violation Rate,
     the $5 Million Amount in Controversy Is Not Met...................................24

V.   CONCLUSION ........................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Abrego Abrego v. The Down Chem. Co.*,
   443 F.3d 676 (9th Cir. 2006)...........................................................................5, 7

*Akana v. Estee Lauder Inc.*,
   2019 WL 2225231 (C.D. Cal. 2019).....................................................................23

*Amaya v. Consolidated Container Company, LP*,
   2015 WL 4574909 (C.D. Cal. 2015).....................................................................15

*Arias v. Residence Inn by Marriott*,
   936 F.3d 920 (9th Cir. 2019)................................................................5, 15, 22

*Armstrong v. Ruan Transp. Corp.*,
   2016 WL 6267931 (C.D. Cal. 2016)..............................................................14, 22

*Avila v. Rue21, Inc.*,
   432 F.Supp.3d 1175 (E.D. Cal. 2020)........................................................passim

*Baretich v. Everett Financial, Inc.*,
   2018 WL 4579857 (S.D. Cal. 2018)......................................................................22

*Beck v. Saint-Gobain Containers*,
   2016 WL 4769716 (C.D. Cal. 2016)......................................................................19

*Buehler v. Saddle Creek Corp*,
   2015 WL 5618871 (C.D. Cal. 2015)......................................................................21

*Carranza v. Nordstrom, Inc.*,
   2014 WL 10537816 (C.D. Cal. 2014).....................................................................12

*Castaneda v. Hungry Man, Inc.*,
   2020 WL 2614608 (C.D. Cal. 2020).......................................................................14

*Cisneros v. Lerner New York, Inc.*,
   2016 WL 4059612 (C.D. Cal. 2016).......................................................................20

*Conrad Assoc. v. Hartford Acc. & Indem. Co.*,
   994 F. Supp. 1196 (N.D. Cal. 1998).......................................................................6

*Dart Cherokee Basin Operating Co., LLC v. Owens*,
   135 S.Ct. 547 (2014).................................................................................................5

*Davis v. Barney's, Inc.*,
   2018 WL 4940801 (C.D. Cal. 2018).......................................................................21

*Dobbs v. Wood Group PSN, Inc.*,
   201 F.Supp.3d 1184 (E.D. Cal. 2016)..............................................................6, 13

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND

*Duncan v. Stuetzle*,
   76 F.3d 1480 (9th Cir. 1996)................................................................5

*Duran v. U.S. Bank National Assn.*,
   59 Cal.4th 1 (2014).................................................................9, 11

*Emrich Touche Ross & Co.*,
   846 F.2d 1190 (9th Cir. 1988)................................................................5

*Fritsch v. Swift Transp. Co. of Ariz., LLC*,
   899 F.3d 785 (9th Cir. 2018)..........................................................22, 23

*Garcia v. Wal-Mart Stores*,
   207 F. Supp.3d 1114 (C.D. Cal. 2016) ..........................................1, 14

*Gaus v. Miles, Inc.*,
   980 F.2d 564 (9th Cir. 1992)................................................................5

*Gonzalez v. Hub Int'l Midwest Ltd.*,
   2019 WL 2076378 (C.D. Cal. 2019)........................................................23

*Guijarro v. Healthcase Servs. Grp.*,
   2020 WL 1983872 (C.D. Cal. 2020)........................................................11

*Harris v. KMI Industrial, Inc.*,
   980 F. 3d 694 (9th Cir. 2020)..........................................................6, 13

*Hernandez v. Starbucks Corporation*,
   2017 WL 2971858 (C.D. Cal. 2017)....................................................16, 22

*Ibarra v. Manheim Invs., Inc.*,
   775 F.3d 1193 (9th Cir. 2015)....................................................passim

*International Brotherhood of Teamsters, Local 2785 v. Federal Motor Carrier
   Safety Administration*,
   986 F.3d 841 (9th Cir. 2021)................................................................4

*Kirby v. Immoos Fire Protection, Inc.*,
   53 Cal.4th 1244 (2012) ....................................................................23

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014)................................................................6

*Lopez v. Aerotek, Inc.*,
   2015 WL 2342558 (C.D. Cal. 2015)....................................................13, 15

*Mejia v. DHL Express (USA), Inc.*,
   2015 WL 2452755 (C.D. Cal. 2015)........................................................16

*Melead v. TVI, Inc.*,
   2020 WL 5407456 (C.D. Cal. 2020)....................................................19, 21

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND

*Mendoza v. Savage Services Corporation*,
   2019 WL 1260629 (C.D. Cal. 2019)..................................................................15

*Mix v. Allstate Ins. Co.*,
   2000 WL 1449880 (C.D. Cal. 2000)....................................................................6

*Montoya v. Sights on Service, Inc.*,
   2020 WL 550691 (C.D. Cal. 2020).....................................................................19

*Nolan v. Kayo Oil Co.*,
   2011 WL 2650973 (N.D. Cal. 2011) ..................................................................17

*Page v. Luxottica Retail N. Am. Inc.*,
   2015 WL 966201 (E.D. Cal. 2015).....................................................................19

*Ray v. Nordstrom, Inc.*,
   2011 WL 6148668 (C.D. Cal. 2011)..................................................14, 17, 22

*Rodriguez v. AT&T Mobility Servs. LLC*,
   728 F.3d 975 (9th Cir. 2013)........................................................................5, 7, 21

*Rosales v. Staples Contract & Commercial, Inc.*,
   2015 WL 4537577 (C.D. Cal. 2015)..................................................................16

*Ruby v. State Farm Gen. Ins. Co.*,
   2010 WL 3069333 (N.D. Cal. 2010) .............................................................14, 22

*Rutledge v. Healthport Technologies, LLC*,
   2017 WL 728375 (N.D. Cal. 2017) ....................................................................13

*Salter v. Quality Carriers, Inc.*,
   974 F.3d 959 (9th Cir. 2020)...........................................................................6, 13

*Sanchez v. Monumental Life Ins. Co.*,
   102 F.3d 398 (9th Cir. 1996)........................................................................5, 7, 16

*Santos v. TWC Administration LLC*,
   2014 WL 12558009 (C.D. Cal. 2014)...................................................................9

*Singer v. State Farm Mut. Auto. Ins. Co.*,
   116 F.3d 373 (9th Cir. 1997)................................................................................1

*Smith v. Diamond Resorts Mgmt.*,
   2016 WL 356020 (C.D. Cal. 2016)....................................................................14

*Tejero v. NRG Energy Servs. LLC*,
   2018 WL 6009705 (N.D. Cal. 2018) ..................................................................14

*Toribio v. ITT Aerospace Controls LLC*,
   2019 WL 4254935 (C.D. Cal. 2019)...................................................................17

*Townsend v. Brinderston Corp.*,

viii

2015 WL 3970172 (C.D. Cal. 2015) ....................................................15

*Vasserman v. Henry Mayo Newhall Memorial Hosp.*,
   65 F.Supp.3d 932 (C.D. Cal. 2014) ...................................................19

*Weigele v. FedEx Ground Package System, Inc.*,
   267 F.R.D. 614 (S.D. Cal. 2010) .........................................................11

*Weston v. Helmerich & Payne International Drilling Co.*,
   2013 WL 5274283 (E.D. Cal. 2013) .......................................11, 14, 22

*Whitaker v. U.S. Renal Care, Inc.*,
   2017 WL 3412203 (C.D. Cal. 2017)...................................................19

*Zamarripa v. Superior Talent Res., Inc.*,
   2019 WL 3246502 (C.D. Cal. 2019).....................................................23

**Statutes**

28 U.S.C. § 1446(a) ...............................................................................5

Bus. & Prof. Code §§ 17200, *et seq.* ....................................................3

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant's Notice of Removal ("Notice"), filed pursuant to CAFA, is improper because Defendant fails to meet its burden by a preponderance of the evidence to plausibly allege that the aggregate amount in controversy exceeds $5,000,000 in order to satisfy CAFA. 28 U.S.C. § 1332(d)(2).

Despite having *exclusive* access to employment records for the entire putative class members, in calculating the amount in controversy, Defendant relies on inaccurate and unreliable variables, as set forth in the Declaration of Timm Sturgeon ("original Sturgeon Declaration") filed in support of Defendant's Notice (Dkt. 1-9), and as further evidenced by the not-yet-filed Supplemental Declaration of Timm Sturgeon ("Suppl. Sturgeon Declaration") (which Defendant provided to Plaintiff's counsel as part of the meet and confer process). The faulty methodologies that Defendant uses to inflate its numbers, as evidenced in the original Sturgeon Declaration and Suppl. Sturgeon Declaration, call into question the accuracy of the evidence that Defendant sets forth, and is a far cry from the "summary-judgment-type evidence" that the Ninth Circuit requires from removing parties in support of their amount in controversy calculations. *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997); *Garcia v. Wal-Mart Stores*, 207 F. Supp.3d 1114, 1119 (C.D. Cal. 2016).

Defendant's second attempt to cure the deficiencies in its amount in controversy calculations, vis-à-vis the Suppl. Sturgeon Declaration, fails. Sturgeon, who lacks any qualifications as a statistician, attests to conducting a "random sample" of a mere ***100*** weekly timesheets, which is replete with errors and cannot be extrapolated to the class. As will be discussed further, Sturgeon's sample: (1) is neither independent nor random; (2) improperly excludes timesheets for the year 2015 (the Class Period begins August 14, 2015), only covers 83 putative class members, and fails to describe whether the sample adequately represents

Defendant's clients (where Defendant would assign the putative Class to work); and (3) fails to state a confidence interval to assess the reliability of the sample. Declaration of Tatiana G. Avakian ("Avakian Decl."), Ex. 4, ¶¶ 18, 21-24, 27, 29-31. These numerous errors result in inflated, inaccurate calculations for the average hours worked per day (and therefore, the total number of work days) by the putative class. *Id.* ¶¶ 18-19, 21-22, 25, 28.

Moreover, Sturgeon attests to *completely different* variables from the ones to which he previously attested in the original Sturgeon Declaration, under penalty of perjury: the total average number of hours worked per day (from *8 to 9.14*); the total number of workdays (from *108,160.8 to 94,670.3*), and the total number of wage statements for the putative class (from *17,248 to 7,218*[2] – over 10,000 wage statements less!). These drastic changes to the data used to calculate the amount in controversy further renders the two declarations unreliable and unusable. Further, even if the calculations were updated with the new data, the data on which Defendant relies flows from the problematic "random sample" of weekly timesheets and therefore, is not competent to support its amount in controversy.

Additionally, to justify its estimated amount in controversy, Defendant unreasonably assumes, for every single putative class member: *five* meal period violations *per week*; *five* rest period violations *per week*; 0.25 hours of unpaid overtime wages for *every single workday*; 0.25 hours of unpaid minimum wages for *every single workday*; the *maximum 30 days* for waiting time penalties; and inaccurate wage statements for *100% of the pay periods* during the class period. In other words, for each of these claims alleged, Defendant assumes a 100% violation rate, without evidentiary support. Likewise, Defendant offers no evidence to support its alternate theory that such violations occurred at a 25% rate. Nowhere in

---

[2] The Suppl. Sturgeon Declaration acknowledges that the total number of wage statements identified in the original Sturgeon Declaration (17,248) is incorrect, due to a calculation error. Avakian Decl., Ex. 2, ¶ 13.

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND

Plaintiff's First Amended Complaint ("FAC")[3] does Plaintiff allege that the violations occurred with these frequencies, and Defendant fails to provide any evidence to support its speculative and unreasonable assumptions. Further, Defendant relies on speculations and self-serving assumptions when calculating the attorneys' fees at 25%. Thus, the calculations in Defendant's Notice are inflated by unreliable variables, and its violation rates are "pulled from thin air." *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1199 (9th Cir. 2015).

As such, Defendant has failed to meet its burden to establish that the amount in controversy requirement is satisfied. For the reasons discussed herein, Plaintiff respectfully requests the Court remand this case to the state court.

## II.    STATEMENT OF FACTS

### A. Plaintiff's Complaint and Defendant's Notice of Removal

On August 14, 2019, Plaintiff filed a civil action alleging class-wide claims against Defendant in the Los Angeles Superior Court. Dkt. 1, Ex. A. Plaintiff's complaint alleged the following causes of actions: (a) unpaid meal period premiums; (b) unpaid rest period premiums; (c) unpaid minimum wages; (d) unpaid overtime wages; (e) unreimbursed business expenses; (f) non-compliant wage statements; (g) wages not timely paid upon termination; (h) violation of Bus. & Prof. Code §§ 17200, *et seq*.; and (i) for unjust enrichment. *Id.*

On October 2, 2019, Defendants removed the action under CAFA. Dkt. 1.

### B. The Parties' Meet and Confer Discussions Prior to the Stay

On October 11, 2019, Plaintiff's counsel sent a meet and confer letter to Defendant's counsel, explaining the perceived deficiencies in Defendant's Notice. Avakian Decl., ¶ 2; Ex. 1. On October 17, 2019 and October 30, 2019, counsel for the Parties met and conferred telephonically regarding Plaintiff's intended motion

---

[3] Defendant's Notice cites to the original Complaint, which was the operative complaint at the time of removal. In this brief, Plaintiff will cite to the paragraphs in the FAC (the current operative complaint) that correspond to the citations to the original Complaint in Defendant's Notice.

to remand. Avakian Decl., ¶ 3; *see also* Dkt. 33. Defendant agreed to provide a supplemental declaration in an effort to address some of the deficiencies that Plaintiff's counsel pointed out. *Id*.

Prior to receiving the supplemental declaration, the Parties discussed scheduling mediation, and stipulated to staying the action, pending the Ninth Circuit's decision in *Intl Brotherhood of Teamsters, et al v. FMCSA*, Case Number 18-73488; *IBT, et al. v. FMCSA*, Case Number 19-70323; *Labor Commissioner State of CA v. FMCSA*, Case Number 19-70329; *Duy Ly, et al. v. FMCSA*, Case Number 19-70413. Dkt. 29. On December 16, 2019, this Court stayed this action until 30 days after the Ninth Circuit's decision. Dkt. 30.

**C. Plaintiff's First Amended Complaint**

Plaintiff filed his First Amended Complaint on December 11, 2019, to assert a cause of action under the Private Attorneys General Act ("PAGA"). Dkt. 27.

**D. The Parties' Meet and Confer Discussions After the Stay**

On January 15, 2021, the Ninth Circuit decided *International Brotherhood of Teamsters, Local 2785 v. Federal Motor Carrier Safety Administration, 986 F.3d 841 (9th Cir. 2021)*. As such, the stay in this action was lifted on February 16, 2021 (the next court day following 30 days). Avakian Decl., ¶ 4.

On January 22, 2021, Plaintiff's counsel contacted defense counsel, to follow-up on the status of the long-promised supplemental declaration. Avakian Decl., ¶ 5. On February 1, 2021, Defendant provided the Supp. Sturgeon Declaration. *Id.* at *¶* 6. Upon review of the Supp. Sturgeon Declaration, Plaintiff's counsel sent a further meet and confer letter to defense counsel on February 17, 2021, the contents of which were discussed during the Parties' further meet and confer conference, held on February 24, 2021. Avakian Decl., ¶ 7; Ex. 2; Dkt. 33.

## III.  LEGAL STANDARD

The removing party bears the burden to establish that federal subject matter jurisdiction exists. *Emrich Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir.

---
4

1988). "Federal jurisdiction **must be rejected** if there is *any* doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (emphasis added); *see also Duncan v. Stuetzle*, 76 F.3d 1480, 1485 (9th Cir. 1996) (same).

A defendant seeking removal under CAFA shall file in the federal forum a notice of removal "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a); *see also Dart Cherokee Basin Operating Co., LLC v. Owens*, 135 S.Ct. 547, 551 (2014). A defendant's good faith allegation that the amount in controversy exceeds the $5 million CAFA jurisdiction threshold will suffice unless challenged; however, if challenged, Defendant bears the burden of proving the propriety of federal court jurisdiction by "a preponderance of the evidence." *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 977 (9th Cir. 2013); *Abrego Abrego v. The Down Chem. Co.*, 443 F.3d 676, 683 (9th Cir. 2006); *see also Dart Cherokee*, 135 S.Ct. at 553-55 ("[e]vidence establishing the amount is required"). Under this burden, a defendant must provide evidence establishing that it is "more likely than not" that the amount in controversy exceeds that amount." *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996). In a removal jurisdictional dispute, the defendant has not only "the burden to put forward evidence showing that the amount in controversy exceeds $5 million," but also the burden "to persuade the court that the estimate of damages in controversy is a *reasonable one*." *Ibarra*, 775 F.3d at 1197 (emphasis added).

"CAFA's requirements are to be tested by consideration of *real evidence* and the reality of what is at stake in the litigation, using *reasonable* assumptions underlying the defendant's theory of damages exposure." *Id.* at 1198 (emphasis added). "While a defendant's assumptions need not be proven, they must "have 'some *reasonable ground* underlying them.' " *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 922 (9th Cir. 2019) (quoting *Ibarra*, 775 F.3d at 1198-99; emphasis added.) It is well-established in the Ninth Circuit that "[a] speculative argument

1   regarding the potential value of the [amount in controversy] is insufficient." *Mix v.*
2   *Allstate Ins. Co.*, 2000 WL 1449880, *3 (C.D. Cal. Apr. 19, 2000) (quoting
3   *Conrad Assoc. v. Hartford Acc. & Indem. Co.*, 994 F. Supp. 1196, 1198 (N.D. Cal.
4   Feb. 10, 1998); see also *Ibarra*, 775 F.3d at 1197 (a defendant "cannot establish
5   removal jurisdiction by mere speculation and conjecture, with unreasonable
6   assumptions."); *Dobbs v. Wood Group PSN, Inc.*, 201 F.Supp.3d 1184, 1188 (E.D.
7   Cal. Aug. 16, 2016) (citing *Ibarra*, 775 F.3d at 1199 (assumptions "cannot be
8   pulled from thin air but need some reasonable ground underlying them.")

9       Most recently, the Ninth Circuit discussed the standards a defendant must
10   meet regarding the amount in controversy, depending on whether the jurisdictional
11   attack is "facial" or "factual" in nature. For a "facial" attack, the court accepts the
12   allegations as true and draws reasonable inferences in the defendant's favor when "
13   'determin[ing] whether the allegations are sufficient as a legal matter to invoke the
14   court's jurisdiction.' " *Salter v. Quality Carriers, Inc.*, 974 F.3d 959, 964 (9th Cir.
15   2020) (citing *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)). In contrast,
16   a "factual attack" challenges the truth of the factual allegations regarding the
17   amount in controversy. *Salter*, 974 F.3d at 964. "When a factual attack is mounted,
18   the responding party 'must support her jurisdictional allegations with '<u>competent</u>
19   <u>proof</u>' ... under the same evidentiary standard that governs in the <u>summary</u>
20   <u>judgment context</u>.' " *Id.* (citing *Leite*, 749 F.3d at 1121; underline added); see also
21   *Harris v. KMI Industrial, Inc.*, 980 F. 3d 694, 700 (9th Cir. 2020) ("[a] factual
22   attack … need only challenge the truth of the defendant's jurisdictional allegations
23   by making a ***reasoned argument*** as to why any assumptions on which they are
24   based are not supported by evidence; emphasis added.)

25   **IV.   ARGUMENT**
26       **A. The Sturgeon Declarations Are Not "Competent Evidence"**
27       Defendant has presented no "competent evidence," as it is required to do,
28   and relies on the same type of evidence that courts in the Ninth Circuit have

consistently found lacking in satisfying the preponderance of evidence burden. *Rodriguez,* 728 F.3d at 977; *Abrego Abrego,* 443 F.3d at 683 (citing *Sanchez,* 102 F.3d at 404). Defendant has failed to offer ***any*** competent evidence because the Sturgeon declarations are hopelessly flawed. The <u>original</u> Sturgeon Declaration was unreliable because it failed to identify the total number of shifts eligible for meal and rest periods, and overtime, failed to explain whether the total "number of recorded hours" included time not worked, and assumed, without support, an 8 hour average number of hours worked per day. (Dkt. 1-9, *generally*.)

In a showing of good faith, Plaintiff agreed for Defendant to provide a supplemental declaration to cure these deficiencies. Despite this second opportunity to remedy the issues identified in the <u>original</u> Sturgeon Declaration, Defendant presented Plaintiff with the not-yet-filed Suppl. Sturgeon Declaration, which is replete with statistical errors and insufficient to establish that the amount in controversy exceeds $5 million. The Supp. Sturgeon Declaration highlights inaccuracies in the data on which Defendant relies, and identifies an unreliable "random sample" that Sturgeon and/or other unnamed individuals conducted. By declaring to a "random" sampling of 100 weekly timesheets (or, according to Sturgeon, 418 workdays) (Avakian Decl., Ex. 2, ¶ 9), the information extrapolated from these results, on behalf of all 1,061 putative class members, and therefore any calculations flowing from this sample, is unreliable, for several reasons.

### 1.    Sturgeon Lacks the Qualifications to Conduct Samples.

Defendant has failed to lay the necessary foundation for the sample it relies upon. Defendant has failed to present any evidence that Sturgeon, or anyone else involved in selecting and reviewing this "survey" of 100 weekly timesheets, is even qualified to conduct such surveys and/or select sample data. The Suppl. Sturgeon Declaration fails to provide ***any*** credentials for himself or his staff that would justify their qualifications as sampling experts. Rather, Sturgeon's actual personal knowledge is admittedly limited to only "Midwest's corporate structure,"

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND

and as Defendant's "President, Secretary, and Treasurer," he has access to vague, undefined "work files and pay data." Avakian Decl., Ex. 2, ¶¶ 2, 5. Access to "work files and pay data" does not establish one's knowledge or ability to conduct a statistically reliable sample. Sturgeon fails to provide any explanation as to what information is contained within those "work files and pay data." The gaps as to what types of putative class member data are available to him are glaring, resulting in Defendant compiling variables together from an unreliable "sample" of 100 timesheets. Further, as to the staff who assisted in collecting the timesheets for the "random sample," the Suppl. Sturgeon Declaration is silent on who retrieved and compiled this data, and what their qualifications are. Avakian Decl., Ex. 2, ¶ 9.

Unlike Sturgeon, Plaintiff's expert, Candice L. Rosevear, presents with extensive qualifications and ample credentials in the field of statistics, as well as data analysis for wage-and-hour class actions. Avakian Decl., Ex. 4, ¶¶ 3-6. Ms. Rosevear's education and practical experience demonstrate that she has specialized knowledge regarding economic, statistical, and empirical analyses in various areas, including wage and hour. *Id.* ¶ 4. She has worked as an economist and analyst for approximately 14 years and has significant expertise in the analysis of company payroll and timekeeping data, statistical sampling, and the estimation of economic damages. *Id.* Further, she has served as an expert economist and expert consultant for various wage and hour matters. *Id.* ¶¶ 5, 6. Thus, Ms. Rosevear is highly qualified to opine on the faulty methodologies Sturgeon adopts.

## 2.   The "Random Sample" Is Tainted with Statistical Errors.

A review of the Suppl. Sturgeon Declaration only provides further confirmation that Sturgeon is unqualified to conduct a sample to be extrapolated to the putative class, given the numerous statistical errors therein. When assessing whether a statistical methodology is reliable, courts should assess the following factors: (1) the sample size, (2) the randomness of the sample, and (3) whether analysis of the sample yields results within a reasonable margin of error. *Duran v.*

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND

*U.S. Bank National Assn.*, 59 Cal.4th 1, 42 (2014); *see also Santos v. TWC Administration LLC*, 2014 WL 12558009, at *7 (C.D. Cal., 2014) (holding the sample was unreliable where expert "did not explain the methodology he used to select the particular wage statements he reviewed, why they constitute a representative sample, or why they provide a reliable basis for extrapolation.")

### (a)    The Sample Size Is Too Small for Extrapolation

Although omitted from the Suppl. Sturgeon Declaration, Defendant's counsel represented to Plaintiff's counsel that the sample consists of the timesheets for 83 putative class members. Avakian Decl., ¶ 9. This means that Defendant only evaluated the records of *less than 8%* of the putative class (83 / 1,061 = 0.078 x 100 = 7.8%). There are <u>17 repeats</u> within the 100 sample weekly timesheets (i.e., the sample includes the time records for the same 17 putative class members). Avakian Decl., Ex. 4, ¶ 24, fn. 22.

Notwithstanding the numerous statistical errors, as further described below, "Mr. Sturgeon's sample size *alone* may lack the statistical power needed to draw reliable inferences about the Class." Avakian Decl., Ex. 4, ¶ 7 (emphasis added). A sample must be sufficiently large to provide reliable information about the larger group. *Id.*, ¶ 29. In order to draw reliable inferences, Mr. Sturgeon would need approximately **<u>383</u>** randomly selected and independent *daily* time records to satisfy a level of statistical precision for close to 100,000 workdays. *Id.*, ¶ 30. Mr. Sturgeon's sample falls dramatically short and these deficiencies make the "random sample" unreliable. Accordingly, using 100 timesheets, and extrapolating to calculate damages for all putative class members, is faulty and unreasonable.

### (b)    The Sample Is Not "Random"

"Sturgeon's sample suffers from measurement bias in that it systematically ignores portions of the population." Avakian Decl., Ex. 4, ¶ 23. A sample must be randomly selected for its results to be fairly extrapolated to the entire class. *Duran, 59 Cal.4th at 43*. Here, the Suppl. Sturgeon Declaration does not describe how the

1   sampling was selected (i.e., whether the sampling is a true "random" sample). Nor

2   were the 100 timesheets provided to Plaintiff's counsel to assess any additional

3   issues with the selection of the sample. Avakian Decl., ¶ 9.

4         Sturgeon declares, "I had staff gather and review a random sample of 100

5   timesheets from potential class members during the potential class period."

6   Avakian Decl., Ex. 2, ¶ 9. This explanation fails to address common and relevant

7   statistical methodology including, what tools were used to randomize the sample

8   prior to selection and what decisions were made to ensure that the sample was an

9   adequate representation of the class. Avakian Decl., Ex. 4, ¶ 24. Moreover, despite

10  having access to all records during the applicable Class Period, Sturgeon omits all

11  timesheets from the year 2015, the first portion of the Class Period, and thus, the

12  sample does not adequately represent the whole Class. *Id*. This error cannot be

13  easily explained away since "the chance of not choosing a timesheet from 2015 as

14  part of a random process is *1 out of 19,153*." *Id.* ¶ 24, fn. 22 (emphasis added).

15  Accordingly, without this basic foundation, the sample suffers from measurement

16  bias and provides unreliable and inflated variables.

17        As Ms. Rosevear aptly notes, "It is unknown whether [Sturgeon's] selection

18  methodology was properly stratified so as to adequately represent Trillium's

19  various clients." Avakian Decl., Ex. 4, ¶ 23. Defendant (a staffing company) has

20  failed to provide any information regarding the total number of Defendant's clients

21  who comprise assignments where the putative class members in this sample

22  worked. Avakian Decl., ¶ 8. Therefore, it is unclear, from the Suppl. Sturgeon

23  Declaration, whether all the putative class members for the 100 timesheets were

24  assigned to work for the same client, or for a select few cherry-picked clients.

25                **(c)    The Sample Lacks Independence**

26        The errors in the Suppl. Sturgeon Declaration continue to compound because

27  Sturgeon failed to utilize a statistical method that would ensure independence in

28  the sampling. Sturgeon's sample is statistically invalid because it is constructed

from the wrong level of data and leads to an incorrectly computed point estimate. Avakian Decl., Ex. 4, ¶ 21. Typically, "[t]o correctly construct a well-designed sample in this matter, the statistician would select a random and ***independent sample of <u>daily</u> time records (not <u>weekly</u> timesheets)*** for Class Members over the Class Period." *Id.* ¶ 16 (with emphasis). Yet, Sturgeon's sample of 100 *weekly* timesheets implies he has 418 total independent, uncorrelated observations when in reality, there are 318 correlated observations and only 100 independent observations. *Id.* ¶ 22. Accordingly, Sturgeon's methodology results in an inflated implied sample size, producing an unreliable average daily hours worked, 9.14. *Id.*

Additionally, Courts in the Ninth Circuit have rejected a defendant's use of averages to calculate damages estimates, as Defendant purports to do here, to calculate the total number of workdays, average number of hours worked per day, and average hourly rate. *See Weston v. Helmerich & Payne International Drilling Co., 2013 WL 5274283, at *5 (E.D. Cal. Sep. 16, 2013)* (reasoning "using an average merely ensures that the calculations are inaccurate for virtually every employee."); *Guijarro v. Healthcase Servs. Grp., 2020 WL 1983872, at *5 (C.D. Cal. April 24, 2020)* (declaration providing averages for the putative class is insufficient to support a 100% violation rate).

### (d)   The Sample Lacks a Confidence Level or Margin of Error

Notably, Sturgeon does not provide standard errors or a confidence interval for his sample. "Standard errors are critically important in statistical sampling in that they allow one to compute the margin of error of the sample statistic at a given level of confidence." Avakian Decl., Ex. 4, ¶ 25. " 'Margin of error' is a statistical measurement of reliability of an estimate produced by sampling" and typically is calculated "using a 95 percent confidence interval." *Duran*, 325 P.3d at 943. As the margin of error increases, it becomes increasingly problematic to rely on the results of sampling to extrapolate out to the whole class. *Weigele v. FedEx Ground Package System, Inc., 267 F.R.D. 614, 624 (S.D. Cal, 2010).* Most importantly,

"[e]ven if Sturgeon had wanted to calculate . . . a margin of error at a particular confidence level, it is impossible for him to do so in a way that is statistically sound due to the flaws in his sampling methodology." Avakian Decl., Ex. 4, ¶ 29. For daily time records of close to 100,000 (Sturgeon attests to 94,670.3 workdays), he would need to assess 383 time records for a 95% confidence level, a 5% margin of error. *Id*., ¶ 30. Thus, even putting aside the other statistical errors, in order to avoid an "intolerably high" margin of error, Sturgeon would need to enlarge his sample size by 3.83 times. *Duran*, 325 P.3d at 943.

### 3. The Data in the Sturgeon Declarations Is Contradictory.

The Sturgeon declarations are unreliable since Sturgeon attests, under penalty of perjury, to completely different variables. In the Suppl. Sturgeon Declaration, the total average number of hours worked per day increased from ***8 to 9.14***, the total number of workdays decreased from ***108,160.8 to 94,670.3***, and the total number of wage statements for the putative class significantly decreased from ***17,248 to 7,218***. Avakian Decl., Ex. 2, ¶¶ 9, 11, 13. These drastic changes to the data render Defendant's calculations in its Notice essentially unusable, since they are not based on the new numbers identified in the Suppl. Sturgeon Declaration. Even if the calculations were updated with the new data, the 100 sample timesheets contains numerous statistical issues (as described above) and is not competent. Further, the inconsistent data and the statistical errors are particularly inexcusable since Defendant has *exclusive* access to the information necessary to support its calculations. In ruling on Plaintiff's motion, it is proper for the Court to consider "which party has access to or control over the records and information required to determine whether the amount in controversy requirement is met." *Carranza v. Nordstrom, Inc.*, 2014 WL 10537816, at *9 (C.D. Cal. Dec. 12, 2014). As such, Defendant has failed to meet its burden by a preponderance of the evidence.

### B. Defendant's Unreliable Evidence Fails to Support a Reasonable Chain of Inferences for its Assumed 100% Violation Rate

Nowhere in either declaration does Sturgeon address why a 100% rate of

violation is reasonable. Although Defendant is "permitted to draw reasonable inferences from the complaint and from evidence," it is "not permitted to pull potential violation rates out of thin air." *Rutledge v. Healthport Technologies, LLC,* *2017 WL 728375, at *2 (N.D. Cal. Feb. 24, 2017)*. Defendant, who has exclusive access to all the putative class member's records, is in the best position to ascertain a reasonable violation rate, based on "real evidence." Although "[d]efendant does not need to comb the record for exact frequency of violation" it still must satisfy its burden to provide "competent evidence." *Lopez v. Aerotek, Inc.,* 2015 WL *2342558, *3 (C.D. Cal. May 15, 2015)*; *Salter, 974 F.3d at 964*.

The Ninth Circuit disfavors a 100% violation rate to calculate the putative class' monetary recovery as "not grounded in real evidence." *Ibarra, 775 F.3d at* *1199*; *Rutledge, 2017 WL 728375, at *2*. Moreover, when "plaintiff alleges a 'pattern and practice' of labor violations, the Ninth Circuit has found that a defendant's assumption of a 100 percent violation rate would be unreasonable." *Dobbs, 201 F.Supp.3d at 1188* (citing *Ibarra, 775 F.3d at 1198-99.*) Indeed, " 'a pattern and practice' of doing something *does not necessarily mean always doing something*." *Ibarra, 775 F.3d at 1198-99* (emphasis added.)

### 1.  A 100% Violation Rate for Plaintiff's Meal and Rest Period Claims Is Purely Speculative.

Defendant has failed to provide any evidence (let alone "competent evidence") that *all 1,061 putative class members* suffered meal and rest period violations on *every single shift* that they worked. Defendant calculates meal periods and rest periods each at a 100% violation rate as follows: average hourly rate of $22.16 x *108,160.80 workdays* = $2,396,843.33 (for a total of $4,793,686.66). Dkt. 1, ¶¶ 18-20. Defendant's 100% violation rate is arbitrary and "not grounded in *real evidence*." *Harris, 980 F.3d at 709, fn. 7* (citing *Ibarra, 775 F.3d at 1199*; emphasis added.) Courts have found that assumptions of *even just one meal and one rest period violation per week* is too speculative when unsupported by any evidence. *See Armstrong v. Ruan Transp. Corp., 2016 WL*

6267931, at *4 (C.D. Cal. Oct. 25, 2016); *see also* e.g., *Smith v. Diamond Resorts Mgmt.,* 2016 WL 356020, at *3 (C.D. Cal. Jan. 29, 2016); *Weston.,* 2013 WL 5274283, at *5; *Ray v. Nordstrom, Inc.,* 2011 WL 6148668, at *3-4 (C.D. Cal. Dec. 9, 2011); *Ruby v. State Farm Gen. Ins. Co.,* 2010 WL 3069333, at *4-5 (N.D. Cal. Aug. 4, 2010); *see also Avila v. Rue21, Inc.,* 432 F.Supp.3d. 1175, 1190-91 (E.D. Cal. Jan. 13, 2020)(finding defendant's use of ***2,118 shifts*** to calculate meal periods, and ***3,177 shifts*** to calculate rest periods was reasonable where the plaintiff alleged a pattern and practice, which was less than ***2.6%*** of all shifts).

Moreover, although Defendant purports to have selected and reviewed 100 timesheets for the putative class to, among other things, determine the total number of shifts eligible for meal and rest periods, the Suppl. Sturgeon Declaration is silent on whether the timesheets reflected any entries for meal periods, the length of meal period entries, or whether the entries for the meal periods were within the first five hours of work, pursuant to Labor Code § 512. Instead of relying on actual records and information within its exclusive possession, Defendant asserts pure speculation that such violations occurred on a 100% basis, which is insufficient to make the requisite showing under CAFA. *See Castaneda v. Hungry Man, Inc.,* 2020 WL 2614608, at *3 (C.D. Cal., May 21, 2020) (this Court found that Defendant's failure to explain methods used in estimation and corroborate testimony with evidence resulted in a failure to put forth "summary-judgment-type evidence").

Contrary to Defendant's assertion, Plaintiff's allegations of a "pattern and practice" do not reasonably support an inference that ***all*** putative class members suffered meal and rest period violations for ***every shift*** worked. Dkt. 1, ¶¶ 18-20; FAC, ¶¶ 118, 124; *See Tejero v. NRG Energy Servs. LLC,* 2018 WL 6009705, at *2 (N.D. Cal. Nov. 16, 2018) (employee's alleged failure to receive all overtime due does not equate to a failure to receive any overtime due); *Garcia,* 207 F. Supp. 3d at 1125 (allegations that defendant employs "uniform policies" does not support a 100% violation rate); *Townsend v. Brinderston Corp.,* 2015 WL 3970172 at *5-6

(C.D. Cal. June 30, 2015) (general allegations of a defendant's unlawful "policy or practice" failed to support a 100% violation rate); *Amaya v. Consolidated Container Company, LP*, 2015 WL 4574909 at *1 (C.D. Cal. July 28, 2015) ("[t]herefore, a defendant cannot assume a 100% violation rate based on the plaintiff's general allegation of a 'pattern and practice' "). Even if the Court were to assess a violation rate, courts in this district have applied a ***20% violation rate*** for meal and rest period claims, "even given the 'pattern and practice' scheme" alleged. *Mendoza v. Savage Services Corporation*, 2019 WL 1260629, at *2 (C.D. Cal. Mar. 19, 2019) (citing cases applying 20% violation rate.)

Similarly, the Plaintiff's use of qualifying words such as "were ***often*** not" and "***on occasion*** when" Plaintiff and the putative Class did not receive compliant breaks denotes that the meal and rest period violations did not occur every single time an employee performed work for Defendant. FAC, ¶¶ 40, 52 (emphasis added). Such allegations support a violation rate of less than 100%. *See Lopez, 2015 WL 2342558, *3* (holding defendant's inference of a 100% violation rate is unsupported by the allegations if plaintiff's other allegations contained qualifying language to suggest anything less than "all" employees.); *see also Arias*, 936 F.3d at 926-27 (estimating ***1 missed rest break per week*** [i.e., **not** 100%], where plaintiff alleged defendants "routinely" failed to compensate for missed rest and meal breaks, "*may* prove to be reasonable …") (emphasis added.)

Moreover, allegations regarding Defendant's "automatic deduction policy" do not suggest there is a 100% violation rate for meal periods; it merely suggests that Defendant deducted 30 minutes for a meal period for each eligible shift, regardless of whether a compliant meal break was provided. FAC, ¶ 53. In other words, putative class members may have received compliant meal periods on certain occasions, with 30 minutes deducted for such meal periods. Further, Plaintiff alleges that Defendant implemented a scheduling policy that "made it difficult" for Plaintiff and the putative Class to receive compliant meal and rest

breaks. *Id.*, ¶¶ 69, 77. To assume a 100% violation rate based on this allegation would be to improperly conflate the meaning of "difficult" with "impossible." Defendant's failure to consider these allegations – and its lack of "competent evidence" – calls into question the reasonableness of its assumptions.

In its Notice, Defendant cites to two district court cases, which are inapposite to the facts here, for the proposition that a 100% violation rate is acceptable for "uniform policy" allegations. In *Mejia v. DHL Express (USA), Inc.*, 2015 WL 2452755, at *4, 5 (C.D. Cal. May 21, 2015), the plaintiff alleged the defendant "adopted and maintained uniform policies," and the court found that the remaining allegations in the complaint were consistent with this allegation. Similarly, in *Sanchez v. Russell Sigler, Inc.*, 2015 WL 12765359, at *5, 6 (C.D. Cal. Apr. 28, 2015), the plaintiff alleged meal and rest period violations occurred "*at all material times*," which allowed for a reasonable inference of universal deprivation. (emphasis added). Unlike the allegations in those cases, here, there are no allegations in Plaintiff's FAC, and Defendant cites to none in its Notice, that states Defendant committed ***each and every*** wage-and-hour violation alleged against ***each and every putative class member*** on ***each and every workday*** during the class period. Further, this Court has routinely disavowed[4] a defendant's reliance on a 100% violation rate without evidentiary support; thus, this Court should disregard Defendant's threadbare assumptions in their entirety.

**2. Defendant Provides No Evidence to Support its 100% Violation Rate for the Unpaid Wages Claims.**

Defendant erroneously assumes that Plaintiff is seeking at least 30 minutes of unpaid time ***per workday***, for ***every single shift*** that ***every single putative class***

---

[4] *See Hernandez v. Starbucks Corporation*, 2017 WL 2971858, at *3 (C.D. Cal. July 12, 2017) (concluding "uniform administration of corporate policy" and "pattern and practice" allegations did not support defendants' speculative assumption of a 100% violation rate); *Rosales v. Staples Contract & Commercial, Inc.*, 2015 WL 4537577, at *3 (C.D. Cal., July 27, 2015) (citing to several cases in the Ninth Circuit that rejected the use of a 100% violation rate, this Court found that defendant's use of a 100% violation rate was without evidentiary support).

*member* has worked. Dkt. 1, ¶¶ 21, 22. Defendant contends, without supporting evidence, that 15 minutes of the total unpaid time should be calculated at an overtime rate, and 15 minutes should be calculated at the minimum wage rate. *Id*. Defendant calculates minimum wages at a 100% violation rate: ***108,160.80 workdays*** x 0.25 hours of overtime per workday x average minimum wage of $10.61 = $286,896.52. Dkt. 1, ¶ 22. Additionally, Defendant calculates overtime wages at a 100% violation rate: ***108,160.80 workdays*** x 0.25 hours of overtime per workday x average hourly rate of $22.16 x 1.5, overtime wage = $898,816.25. Dkt. 1, ¶ 21. Defendant's alleged "conservative" estimates are not supported by viable evidence. *Toribio v. ITT Aerospace Controls LLC*, 2019 WL 4254935, at *3 (C.D. Cal. Sep. 5, 2019) (holding that defendant "cannot [ ] simply pull violation rates out of thin air, whether it characterizes them as 'conservative' or not, and conclusively state that they are 'reasonable inference[s]' ").

  Plaintiff's unpaid wages claim is based on his allegations of not receiving duty-free meal periods. But, Defendant automatically assesses a 100% violation rate of 30 minutes of unpaid time for every single shift within the class period, notwithstanding Plaintiff's allegations contain language suggesting violations less than 100%. FAC, ¶¶ 40, 52, 118, 124. Courts have found that even just a ***one*-hour** estimate of uncompensated overtime ***per week*** (significantly less than Defendant's estimates, in the present case) is too speculative when it is not supported by any evidence. *See e.g., Ray*, 2011 WL 6148668, at *3 (allegation that defendant "failed to pay 'all' California hourly employees at least some regular and overtime hours" did not support defendant's estimate of one hour of regular pay and one hour of overtime pay per pay period); *Nolan v. Kayo Oil Co.*, 2011 WL 2650973, at *4 (N.D. Cal. Jul. 6, 2011) ("Simply assuming that every employee…worked at least one hour of overtime a week, without some facts or evidence to support these assumptions, is insufficient to meet Defendant's evidentiary burden."); *see also Avila*, 432 F.Supp.3d. at 1190-91 (finding defendant's use of 2,118 hours to

calculate unpaid overtime hours and unpaid minimum wages was reasonable, for "pattern and practice" allegation, which was less than ***0.1%*** of all hours worked).

Additionally, Defendant's supplemental declaration does not cure this omission to provide competent evidence since it calculates data from an unreliable sample of 100 timesheets in order to erroneously extrapolate to the whole putative class. Accordingly, it would be improper to allow Defendant to calculate minimum wage and overtime wage claims based on a statistically flawed sample.

Moreover, Defendant's 100% violation rate for the unpaid overtime claim contradicts its own data. In the Suppl. Sturgeon Declaration, Sturgeon attests that only ***60.5%*** of the 418 workdays contained shifts with more than 8 hours of work time recorded (i.e., shifts eligible for overtime). Avakian Decl., Ex. 2, ¶ 11. Defendant's violation rates, therefore, are blatantly wrong and inflated. Its representations are speculative, and must be rejected. *Ibarra*, 775 F.3d at 1199.

### 3.   Defendant's Calculation of Waiting Time Penalties Is Inflated and Unsupported by Competent Evidence.

Defendant assumes, without supporting evidence, that ***all*** 720 potential class members whose temporary assignments ended within the relevant time period are entitled waiting time penalties up to the maximum of 30 days regardless of whether a terminated employee actually received final wages before the 30 days. Dkt. 1, ¶ 24. Defendant attributes a value of $3,829,248.00 for this claim, which was calculated as follows: 720 former temporary employees x average hourly rate of $22.16 x 8 hours per day x 30 days. Dkt. 1, ¶ 24. This 100% violation rate is neither supported by reliable evidence nor reasonably inferred from the allegations.

The average daily wages for the putative class members is flawed, in that it is based on Defendant's assumption that the putative class members worked an average of 9.14 hours per day. This figure was calculated from an unreliable sample of 100 timesheets, as set forth above. Avakian Decl., Ex. 2, ¶ 11. This figure contradicts the <u>original</u> Sturgeon Declaration, where Sturgeon testified (again, without support), that the putative class members worked an average of 8

hours per day. Dkt. 1, ¶ 24. Also, neither declaration describes whether the 720 individuals are full-time or part-time employees. *See Melead v. TVI, Inc., 2020 WL 5407456, at *3 (C.D. Cal., 2020)* (finding defendant's estimation of 8 hours worked per day unreasonable where defendant has not provided any evidence suggesting how many of the 2,744 terminated employees were full-time employees). Further, the calculation of waiting time penalties "must be colored by the nature and duration of the work at issue" and 'cannot be pulled from thin air.' *Montoya v. Sights on Service, Inc., 2020 WL 550691, at *4 (C.D. Cal. 2020)* (finding defendant's assumption of 8 hours per day unreasonable where class members were sporadically engaged to work and earned wages in a manner that fell short of full-time employment) (quoting *Ibarra, 775 F.3d at 1199*).

Moreover, Plaintiff alleges that putative class members may be entitled to penalties for "***up to*** a maximum of thirty days" – not that each class member is automatically entitled to the maximum penalty for ***all thirty days***. *See* FAC, ¶ 150 (emphasis added). *Page v. Luxottica Retail N. Am. Inc., 2015 WL 966201, at *5 (E.D. Cal. Mar. 3, 2015)* (reasoning plaintiff's allegations of "up to" the 30-day maximum does not support an assumption the 30-day maximum penalty is warranted); *Vasserman v. Henry Mayo Newhall Memorial Hosp., 65 F.Supp.3d 932, 978 (C.D. Cal. 2014)* (same and no support in the record for Defendant's assumption). It is entirely possible that some former employees were paid their wages timely, or to the extent that they were not, that Defendant paid such wages at some point before the thirty days. Further, District courts in the Ninth Circuit have consistently rejected calculating the maximum waiting time penalties. *See Whitaker v. U.S. Renal Care, Inc., 2017 WL 3412203, at *2 (C.D. Cal. Aug. 8, 2017)* (finding that defendant failed to provide evidence for its assumption that each former employee suffered a wage violation and that each former employee was entitled to a full 30 days' of wages); *Beck v. Saint-Gobain Containers, 2016 WL 4769716, at *3 (C.D. Cal. Sep. 12, 2016)* (same); *Cisneros v. Lerner New*

*York, Inc.*, 2016 WL 4059612, at *4 (C.D. Cal. July 25, 2016) (same).

Some district courts have found that violation rates of 25% to 60% for waiting time penalties can be reasonably assumed as a matter of law based on 'pattern and practice' or 'policy and practice' allegation. *Avila*, 432 F.Supp.3d at 1189. In *Avila*, the court found a 40% violation rate- a median between 25% and 60%- was reasonable where the plaintiff alleged a policy and practice of not paying its employees their regular and overtime wages and requiring employees to work through their meal and rest periods without pay. *Avila*, 432 F.Supp.3d at 1189. Even assuming that the Court were to adopt a 40% violation rate for the waiting time penalty claim (which is unsupported by evidence), such calculations are far lower than the $3.8 million in damages Defendant estimates (Dkt. 1, ¶ 24): $22.16 x 9.14 hours/day x 30 days maximum penalty x 288 former employees [40% of 720] = $1,749,966.34.

### 4. Defendant's Calculations for the Inaccurate Wage Statement Claim Are Likewise Speculative.

Defendant claims that during the applicable statute of limitations, 460 putative class members worked a cumulative amount of 7,218 pay periods, and thus, 7,218 wage statements were issued during this period. Avakian Decl., Ex. 2, ¶ 13. Based on the *17,248* inaccurate wage statements attested to in the original Sturgeon Declaration, Defendant calculates the total amount for the inaccurate wage statement claim as $1,701,800.00, as follows: (460 initial wage statements x $50 = $23,000.00) + (16,788 subsequent wage statements x $100 = $1,67,880.00.) Dkt. 1, ¶ 25. First, as set forth above, the accuracy of the 7,218 wage statements is questionable, given the *17,248* wage statements in the original Sturgeon Declaration. Dkt. 1, Ex. 1, ¶ 11.

Additionally, Defendant significantly overstates the allegations in Plaintiff's FAC by assuming *all 7,218 wage statements* were inaccurate. Dkt. 1, ¶ 25. Plaintiff's allegations regarding unpaid wages for missed meal and rest periods are limited only to "*where* a compliant meal and/or rest period was not provided," i.e.,

not at all times. FAC, ¶ 139 (emphasis added). Further, Plaintiff's additional allegations regarding meal and rest breaks do not reasonably infer a 100% violation rate (as discussed above). FAC, ¶¶ 40, 52.

Courts in this District have routinely rejected the use of a 100% violation rate for inaccurate wage statement calculations, as such a violation rate is too speculative. *See Rodriguez v. US Bank National Association*, 2016 WL 5419403, at *5-6 (C.D. Cal. Sep. 23, 2015) (dismissing the defendant's use of a 100% violation rate as "unsupported and speculative" because plaintiff's "pattern and practice" allegations did not mean that there were wage and hour violations during each and every pay period. The court instructed that defendant could have met its burden of proof if a sampling demonstrated the likelihood that putative members were paid 30 days late or proffered evidence about its actual practices and policies); *Buehler v. Saddle Creek Corp*, 2015 WL 5618871, at *5 (C.D. Cal. Sep. 23, 2015) (rejecting the defendant's use of the statutory maximum penalty because without evidence the court could not draw an inference that every wage statement was a violation"). Further, this Court has disavowed a defendant's reliance on a 100% violation rate without evidentiary support. *See Davis v. Barney's, Inc.*, 2018 WL 4940801, at *3 (C.D. Cal., Oct. 11, 2018) (this Court rejected the defendant's assumption of a 100% violation rate as conclusory, speculative, and insufficient to establish the amount in controversy). Therefore, Defendant has not provided a reliable evidentiary basis for its assumption of a 100% violation rate.

### C. Defendant's Unreliable Evidence Fails to Support a Reasonable Chain of Inferences for a 25% Violation Rate

Additionally, Defendant's alternative violation rate of 25% for meal and rest period claims is not reasonable simply because it is less than a 100% violation rate. *See Melead,* 2020 WL 5407456, at *3 (an assertion that it could have used a 100% violation rate does not independently justify a lower rate). Yet, Defendant still asks the Court to accept its assumption without providing an evidentiary basis.

Defendant relies on a few district court opinions to argue that "pattern and

21

1  practice" allegations support a 25% assumption. *See Baretich v. Everett Financial,*
2  *Inc.,* 2018 WL 4579857, at *4 (S.D. Cal., Sept. 25, 2018); *Elizarraz v. United*
3  *Rentals. Inc.,* 2019 WL 1553664 (C.D. Cal. Apr. 9, 2019); *Hernandez v. Nuco2*
4  *Mgmt., LLC,* 2018 WL 933506 (E.D. Cal. Feb. 16, 2018). In *Elizarraz,* the court
5  found the 25% violation rate was reasonable where, in addition to "pattern and
6  practice" allegations, the plaintiff ***acknowledged*** this rate in the moving papers.
7  2019 WL 1553664, at *3, 4. In *Baretich,* contrary to Defendant's representation in
8  its Notice, the court did not find that a 25% violation rate was reasonable. Quite the
9  opposite: the court, relying on the Ninth Circuit's decision in *Ibarra,* 775 F.3d at
10 1199, found that Defendant's assumptions of a 100% violation rate and a 25%
11 violation rate were not grounded in real evidence. *Baretich,* 2019 WL 1553664, at
12 *5. And, while *Hernandez* did find that, based on an alleged pattern and practice, a
13 25% violation rate for the meal and rest period claims was permissible, other
14 courts have found that assumptions of even just one meal and one rest period
15 violation per week is too speculative when unsupported by any evidence. *See*
16 *Armstrong,* 2016 WL 6267931, at *3; *Weston,* 2013 WL 5274283, at *3; *Ray,* 2011
17 WL 6148668, at *3; *Ruby,* 2010 WL 3069333, at *4-5. Accordingly, Defendant
18 has failed to meet its burden in establishing a violation rate and their assumptions
19 of 100% or 25% violation rate should not be given any weight.

20 **D. Defendant's Calculation of Attorneys' Fees at 25% Is Unsupported**

21 "The defendant retains the burden … of proving the amount of future
22 attorneys' fees by a preponderance of the evidence." *Arias,* 936 F.3d at 927.
23 Defendant's reliance on *Fritsch v. Swift Transp. Co. of Ariz., LLC,* 899 F.3d 785,
24 795 (9th Cir. 2018) to summarily conclude that a 25% benchmark for attorneys'
25 fees is appropriate, without meeting their evidentiary burden, is wrong. In *Fritsch,*
26 the Ninth Circuit squarely rejected this very argument:

27     [W]e reject [Defendant's] argument that we should hold that, as a
       matter of law, the amount of attorneys' fees in controversy in class
28     actions is 25 percent of all other alleged recovery. … <u>Such a per se</u>

equitable rule is inapplicable in this context, however. As we have explained, ***the defendant must prove the amount of attorneys' fees at stake by a preponderance of the evidence; we may not relieve the defendant of its evidentiary burden by adopting a per se rule for one element of the amount in stake in the underlying litigation***.

*Id.*, at 796 (emphasis added); *see also Avila*, 432 F.Supp.3d at 1193-94 (the Court rejected defendant's argument that a per se rule of calculating attorneys' fees at a rate of 25%, without any evidence, was appropriate); *Zamarripa v. Superior Talent Res., Inc.*, 2019 WL 3246502, at *6 (C.D. Cal. July 19, 2019) (holding that "simply ask[ing] the Court to adopt the 25 percent benchmark" without providing any evidence is insufficient to meet the defendant's burden); *Akana v. Estee Lauder Inc.*, 2019 WL 2225231, at *7 (C.D. Cal. May 23, 2019) (holding the defendant's conclusory assertion that the plaintiff is entitled to 25% attorneys' fees of the total recovery without evidence is insufficient); *Gonzalez v. Hub Int'l Midwest Ltd.*, 2019 WL 2076378, at *6 (C.D. Cal. May 10, 2019) ("Defendant's mere reference to the 25% benchmark, without more, fails to establish the amount of attorneys' fees in controversy."). Accordingly, there is no per se 25% benchmark rate for attorney fees when calculating the amount in controversy for CAFA.

Here, Defendant provides a mere legal conclusion, devoid of evidentiary support, for the assumed attorneys' fees presented. Dkt. 1, ¶¶ 27-29. Defendant fails to provide any evidence, to support its attorneys' fee calculations. Further, even if this Court were to accept the bare legal conclusions offered by Defendant as to the attorney's fees at issue, Defendant's calculation of attorneys' fees are inflated. Labor Code § 218.5 does not authorize attorneys' fees for section 226.7 claims alleging the failure to provide statutorily mandated meal and rest periods. *Kirby v. Immoos Fire Protection, Inc.*, 53 Cal.4th 1244, 1248 (2012). Nevertheless, Defendant calculates attorneys' fees for these claims. Dkt. 1, ¶¶ 26, 29.

Therefore, the Court should follow the Ninth Circuit's mandate in *Fritsch* and find there is no reasonable basis for the inflated attorneys' fees amount.

### E. Alternatively, Should the Court Accept a 25% Violation Rate, the $5 Million Amount in Controversy Is Not Met

Even if the Court were to apply a 25% violation rate, Defendant still cannot prove, by a preponderance of evidence, that the amount in controversy exceeds $5 million. Based on the revised variables for wage statements (7,218), workdays (94,670.3), and the daily hours (9.14), the calculations fall **below** $5 million.

| Claims | Calculation at 25% Violation Rate[5] |
|---|---|
| Meal Periods | $22.16 average hourly pay x 94,670.3 workdays x .25 = **$524,473.46** |
| Rest Periods | $22.16 average hourly pay x 94,670.3 workdays x .25 = **$524,473.46** |
| Overtime Wages | 94,670.3 workdays x .25 hours of overtime per workday x $22.16 average hourly pay x 1.5 x .25  = **$196,677.55** |
| Minimum Wage | 94,670.3 workdays x .25 hours of time per workday x $10.61 average minimum wage x .25  = **$62,778.24** |
| Liquidated Damages | Damages in an amount equal to wages unlawfully unpaid and interest thereon = **$62,778.24** |
| Waiting Time | 180 former employees (25% of 720) x $22.16 per hour x 9.14 hours per day x 30 days = **$1,093,728.96** |
| Wage Statements | ((460 wage statements x $50 = $23,000) + (6,758 wage statements x $100 = $675,800)) = $698,800 x .25  = **$174,700.00** |
| **TOTAL (without attorneys' fees)** | **$2,639,609.91** |
| Attorneys' Fees | 25% of $2,639,609.91  = **$659,902.48** |
| **TOTAL (with attorneys' fees)** | **$3,299,512.39** |

It is anticipated that Defendant will argue that, even under the alternative 25% violation rate, the inaccurate wage statements and waiting time penalties should be calculated at a 100% violation rate. According to Defendant, the 25% violation rate applies to 25% of the shifts, and therefore, all of the putative class

---

[5] Should the Court apply a 25% violation rate, it should be applied when calculating _**all**_ of the claims identified in Defendant's Notice. Although Defendant's Notice applies a 25% violation rate to the meal and rest period claims only, because the unpaid wages claim is related to the meal period claim, a 25% violation rate should apply to the unpaid wages claim, and liquidated damages.

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND

members that fall within the statutory periods could be entitled to waiting time penalties, and all of the wage statements would be inaccurate. However, Defendant's argument still assumes, without any evidence, that the employees would be entitled to the ***maximum*** waiting time penalties of 30 days for untimely wages. As set forth above, the authority in this Circuit rejects these speculative assumptions. If only the waiting time penalties were reduced, such that only 40% of the 720 former putative class members were entitled to 30 days of waiting time penalties (pursuant to *Avila*, 432 F.Supp.3d. at 1189), the waiting time penalties would be reduced to $1,749,966.34 (288 former employees x $22.16 x 9.14 hours/day x 30 days). Even if the inaccurate wage statements were calculated at 100% violation rate at $698,800 ((460 wage statements x $50 = $23,000) + (6,758 wage statements x $100 = $675,800)), the total amount in controversy (when calculating the remaining damages at 25%, as set forth in the table above, and including attorneys' fees, which really should not be calculated, at all), is $4,774,934.11, which is still less than the $5 million requirement.

## V.   CONCLUSION

Based on the foregoing reasons, this Court lacks subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). Accordingly, Plaintiff respectfully requests that this Court remand this case to the state court.

Dated: March 12, 2021

**MARLIN & SALTZMAN, LLP**
**TOJARIEH LAW FIRM, PC**


By:   /s/ Tatiana G. Avakian
   Stanley D. Saltzman, Esq.
   Tatiana G. Avakian, Esq.
   Attorneys for Plaintiffs

PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND