# EXHIBIT 4

**TO THE DECLARATION OF
TATIANA G. AVAKIAN ISO
PLAINTIFF'S
MOTION TO REMAND**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRYANT PATTON, individually, and on behalf of others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>MIDWEST CONSTRUCTION SERVICES, INC. DBA TRILLIUM CONSTRUCTION/DRIVERS, a California corporation, and DOES 1 through 100, inclusive,<br><br>    Defendant. | CASE NO. 2:19-cv-02580-JFW-MAA |

**Declaration of Candice L. Rosevear**
**March 11, 2021**

1

# Table of Contents

I.   Introduction ............................................................................................................3

II.  Qualifications...........................................................................................................3

III. Summary of Opinions..............................................................................................4

IV. Overview of Midwest Construction Services, Inc....................................................5

V.  Overview of the Sample Described in the Supplemental Sturgeon Declaration ...................6

VI. Overview of a Well-Designed Statistical Sample and Proper Expression of the Resulting
     Point Estimate .........................................................................................................8

VII. The Sample Described in the Supplemental Sturgeon Declaration and the Average Shift
     Length Statistic Estimated from that Sample Are Not Statistically Valid and, Therefore,
     Would Yield Unreliable Results with an Unknown Error Rate in a Damages Analysis.....9

     A.  Mr. Sturgeon Selects His Sample at the Incorrect Level of Data ..............................10

     B.  Mr. Sturgeon's Sample Suffers from Measurement Bias ..........................................11

     C.  Mr. Sturgeon's Sample Fails to Meet the Conditions for Inference as the
         Observations are Not Independent and Random .......................................................12

     D.  Mr. Sturgeon's Average Shift Length Statistic Is Unreliable and The Precision of
         His Statistic Cannot Be Calculated Due to the Numerous Flaws in his Statistical
         Sampling Analysis ...................................................................................................13

VIII. Even if Mr. Sturgeon Corrected the Statistical Issues Outlined Above, His Chosen
     Sample Size Alone May Lack the Statistical Power Needed To Draw Reliable Inferences
     About the Class...........................................................................................................14

IX. Conclusion ..............................................................................................................15

# I.      Introduction

1.      I, Candice L. Rosevear, am a Principal at Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. I have been asked by counsel for Plaintiff in the matter regarding Midwest Construction Services, Inc., DBA Trillium Construction/Drivers ("Trillium"), to review the Supplemental Declaration of Timm Sturgeon, filed February 1, 2021 ("Supplemental Sturgeon Declaration"), and to opine on the validity of the sample Mr. Sturgeon used therein to estimate the length of the workdays worked by Class Members during the period August 15, 2015 to the present, inclusive, ("Class Period").

2.      The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $450 per hour for my work on this matter and my compensation is in no way contingent on the opinions provided or the outcome of this case.

# II.     Qualifications

3.      I hold a Master of Business Administration, with a concentration in economics, econometrics and statistics, and finance, from the University of Chicago Booth School of Business, as well as a bachelor's degree in business, with high distinction, from Indiana University's Kelley School of Business in Indianapolis.

4.      I have been employed as an analyst and economist for approximately 14 years. I have been employed at Global Economics Group for over eight years. Prior to that, I worked for approximately five years at Chicago Partners, an economics consulting firm. Over the course of my career, I have been responsible for conducting and managing economic, statistical, and empirical analyses in various areas, including wage and hour, labor discrimination, antitrust, securities, valuation, and general damages. I have worked extensively on statistical analyses in labor disputes involving

hiring, promotion, and pay issues. I have significant expertise in the analysis of company payroll and timekeeping data, statistical sampling, financial modeling, the analysis of stock and bond price behavior, the estimation of economic damages, and the valuation of companies and financial instruments. I have been responsible for building, managing, and analyzing large and complex multi-dimensional databases on some of the highest profile cases, including AMD v. Intel.

5.     My experience includes work for plaintiffs, defendants, and an independent mediator. I have submitted expert reports and expert declarations to various federal and state courts. I have also worked on statistical, economics, and data projects outside the context of litigation.

6.     My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III.    Summary of Opinions

7.     I understand that counsel for Defendant in this matter intends to rely upon the sample statistic and other estimations provided in the Supplemental Sturgeon Declaration to conduct an analysis of the estimated amount in controversy. I have been asked by counsel for Plaintiff in this matter to review the Supplemental Sturgeon Declaration and to opine on the construction of the sample described therein and the validity of the statistic calculated from that sample.[1] Based on a careful review of his methodology, I have determined that the sample and the statistic that Mr. Sturgeon calculates from that sample (i.e., the average number of hours worked per day) are not statistically valid and, therefore, would yield unreliable results with an unknown error rate in a damages analysis. Furthermore, even if Mr. Sturgeon were to correct the statistical errors in his sampling methodology, Mr. Sturgeon's sample size alone may lack the statistical power needed to draw reliable inferences about the Class.

---

[1] I have not been provided with the underlying data that Mr. Sturgeon used in his analysis. It is my understanding that counsel for Plaintiff was not provided with this information.

8.      The remainder of my declaration is organized as follows: **Section IV** provides an overview of Midwest Construction Services, Inc.'s business function. **Section V** provides an overview of the sample described in the Supplemental Sturgeon Declaration. **Section VI** provides an overview of a well-designed statistical sample. **Section VII** describes how Mr. Sturgeon's sample and the point estimate statistic that he calculates from that sample (i.e., the average number of hours worked daily) are not statistically valid and would yield unreliable results with an unknown error rate in a damages analysis. **Section VIII** explains how even if Mr. Sturgeon corrected the statistical problems with his sample selection, his chosen sample size alone may lack the statistical power needed to draw reliable inferences about the Class. **Section IX** provides my conclusions.

9.      I reserve the right to amend this declaration to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.   Overview of Midwest Construction Services, Inc.

10.     Midwest Construction Services, Inc., DBA Trillium Construction/Drivers ("Trillium") is the 24th largest industrial staffing firm in the United States.[2] Trillium has more than 90 branch offices with nearly 400 recruitment professionals who assist more than 22,000 companies with staffing and recruitment, including truck driver staffing to various motor carriers. In addition, Trillium offers solutions for the payment of wages, payroll and unemployment taxes, and workers' compensation insurance for its personnel, as well as interviews, background checks, and skills testing.[3]

---

[2] *See* https://trilliumstaffing.com/hire/aboutus/.
[3] *See* https://trilliumstaffing.com/hire/process/.

## V.   Overview of the Sample Described in the Supplemental Sturgeon Declaration

11.     Mr. Sturgeon[4] evaluated the data recorded in Trillium's internal record keeping software, Crystal Report Writer, for the time period, "August 14, 2015 to September 6, 2019 (the date of the last pay period when the data was pulled)," and determined "that there were at least 1,061 non-exempt, hourly workers who worked as truck drivers in California that fit Plaintiff's alleged class definition from August 14, 2015 to September 6, 2019."[5] Using the same software system, he determined that those potential class members worked 865,286.40 hours from August 14, 2015 to September 6, 2019.[6]

12.     I understand that counsel for Defendant asked Mr. Sturgeon to determine the number of hours worked daily by the potential class members that he identified. According to Mr. Sturgeon, the Crystal Report Writer software does not track the number of hours worked daily, therefore, he had to gather that information manually from the potential class members' weekly timesheets. Mr. Sturgeon selected a "random sample" of 100 weekly timesheets from "tens of thousands of time sheets during the potential class period," and calculated the average shift length from the daily data in the set of 100 weekly timesheets. Mr. Sturgeon describes his sample selection and estimation process as follows:

> The Crystal Report Writer System does not contain information regarding the number of hours that the potential class members worked on a daily basis. Instead, the payroll department manually inputs the weekly hours a potential class member worked from the potential class member's time sheets. Therefore, the only way to determine the number of hours that a potential class member worked on a particular day is to manually review that potential class member's time sheet. There are tens of thousands of time sheets during the potential class period. To arrive at the number of workdays, I had staff gather and review a random sample of 100 time sheets

[4] According to his Declaration, Mr. Sturgeon is the President, Secretary and Treasurer of Midwest Construction Services, Inc., Supplemental Sturgeon Declaration, ¶2.
[5] Supplemental Sturgeon Declaration, ¶7. The Class Period spans August 14, 2015 to the present, inclusive.
[6] Supplemental Sturgeon Declaration, ¶8.

from potential class members during the potential class period. From these 100 time sheets, we determined that the average number of hours worked per day was 9.14 hours. Therefore, to calculate the number of workdays, we took the total number of hours worked (865,286.40 hours) and divided this by the average number of hours worked per day from our review of the random sample of time sheets (9.14 hours). This amounted to 94,670.3 workdays.[7]

13.     He goes on to explain that the 100 weekly timesheets contained data on 418 workdays of various lengths. He said:

In addition, my staff analyzed the random sample of 100 time sheets from the potential class period to determine the number of days where the hours worked exceeded 3.5 hours, 5 hours, and 8 hours. These 100 time sheets contained a total of 418 workdays. Of these 418 workdays, 415 workdays had more than 3.5 hours of worktime recorded (99.3%), 413 workdays had more than 5 hours of worktime recorded (98.8%), and 253 of these workdays had more than 8 hours of worktime recorded (60.5%).[8]

14.     To summarize, Mr. Sturgeon analyzed the daily data from 418 workdays, which he gathered from 100 weekly timesheets, and concluded that potential class members worked shifts that were 9.14 hours in length, on average, during the Class Period. Notably, Mr. Sturgeon does not include information about the precision of his statistic,[9] nor does he describe the methodology he and his staff used to construct his sample[10] – both of which are critical components of a statistical sampling analysis.

---

[7] Supplemental Sturgeon Declaration, ¶9.
[8] Supplemental Sturgeon Declaration, ¶11.
[9] He does not provide standard errors or a confidence interval for his calculated average shift length estimate of 9.14 hours. Even if he had wanted to calculate standard errors, or a margin of error at a particular confidence level, it is impossible for him to do so in a way that is statistically sound due to the flaws in his sampling methodology, as will be described below.
[10] In particular, he does not describe the tools that were used to ensure his sample selection process is random, independent, and representative of the population for the variable of interest, which in this case is the length of a daily shift worked by Class Members during the Class Period.

## VI.   Overview of a Well-Designed Statistical Sample and Proper Expression of the Resulting Point Estimate

15.     Before expounding upon the problems with Mr. Sturgeon's analysis, let us first establish the basic definition of a well-designed statistical sample. Put simply, a sample is a representative subset of the population.[11] In this matter, since Mr. Sturgeon is interested in estimating the number of hours worked per day, the "population" is all the daily time records for each Class Member during the Class Period. For a sample to be "representative," each observation in the sample should be selected randomly to form a representative cross section of the population.[12]

16.     To correctly construct a well-designed sample in this matter, the statistician would select a random and independent[13] sample of daily time records (not weekly timesheets) for Class Members over the Class Period. Given that samples inherently contain some level of imprecision or sampling error, one would select a sample size that yields an appropriate level of precision for the task at hand (e.g., a 95% confidence level and a 5% margin of error).

17.     Next, from the resulting sample, one would calculate the statistic, or "point estimate," for the variable of interest – i.e., in this case, the average (and median) number of hours worked per day.[14] This resulting average is referred to in statistics as

---

[11] Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition), p. 333.

[12] Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition), p. 335.

[13] Random selection refers to the process where each object in a population has an equal chance of being selected. "When you draw at random, all the tickets in the box have the same chance to be picked" (Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition), p. 225.) Independence is the state where selected objects do not depend on the values of the other selected objects. "Two things are independent if the chances for the second given the first are the same, no matter how the first one turns out. Otherwise, the two things are dependent" (Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition), p. 230.).

[14] The median could be a better indicator of the typical shift length since the mean (or average) can be affected by outliers, especially in this situation where Mr. Sturgeon is working with a small sample size. "The average of a list of numbers equals their sum, divided by how many there are" (Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition), p. 59.). "The median of a list is defined so that half or more of the entries are at the median or bigger, and half or more are at the median or smaller" (Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition), p. 65.). It is prudent for the statistician to evaluate both measures of central tendency in a statistical sampling exercise for the application at issue here. Mr. Sturgeon does not report a median in his Declaration.

a point estimate since it represents a single point on a number line. The statistician would then express the point estimate along with the confidence level and margin of error, to represent the range of possible outcomes along the number line for a given level of precision. With a sample large enough to support a level of precision at a 95% confidence level and a 5% margin of error, for example, the statistician could say that the point estimate from the sample is accurate to within +/- 5% of the real population value 95% of the time.[15]

## VII. The Sample Described in the Supplemental Sturgeon Declaration and the Average Shift Length Statistic Estimated from that Sample Are Not Statistically Valid and, Therefore, Would Yield Unreliable Results with an Unknown Error Rate in a Damages Analysis

18.     Mr. Sturgeon's sample and the statistic calculated from his sample (i.e., the average number of hours worked daily) are not statistically valid and, therefore, would yield unreliable results with an unknown error rate in a damages analysis. Mr. Sturgeon's analysis suffers from the following statistical problems: (1) his sample is constructed from the wrong level of data, leading to an incorrectly computed point estimate and an inflated implied sample size; (2) his sample suffers from measurement bias, in that the observations within it are not representative of the class; (3) his sample fails to meet the conditions for inference, in that the observations are not independent and random; and (4) he fails to state a confidence interval to define a rate of error.

19.     Based on these issues, the sample and resulting point estimate statistic – i.e., that the average workday is 9.14 hours in length – is unreliable. Notably, Mr. Sturgeon does not provide standard errors or a confidence interval for his sample statistic. The Court, therefore, does not know the precision of his 9.14 hours average estimate, or the range of possible outcomes from his analysis at any level of precision.

---

[15] For additional information on statistical sampling, *see* Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition), pp. 331-438. *See also,* Wooldridge, Jeffrey M. *Introductory Econometrics: A Modern Approach* (Fifth Edition), pp. 755-756.

Even if Mr. Sturgeon had wanted to calculate standard errors or a margin of error at a particular confidence level, it is impossible for him to do so in a way that is statistically sound due to the flaws in his sampling methodology. Thus, his point estimate of 9.14 hours per day cannot be used to generalize about the Class and would yield unreliable results with an unknown error rate in a damages analysis.

20.     I describe each issue in turn in the paragraphs that follow.

### A.     Mr. Sturgeon Selects His Sample at the Incorrect Level of Data

21.     First, he selects his sample at the incorrect level of data, leading to an incorrectly computed point estimate and an inflated implied sample size. The variable of interest in this matter is daily time records – not weekly timesheets. The 418 daily records that he sourced from 100 timesheets are correlated with one another (because each timesheet has multiple workdays for an employee) and are not independent observations. Let us take a simple illustrative example of a two-timesheet sample to highlight the issue with his calculation of the point estimate. Assume Timesheet 1 contains data for an employee whose schedule determines that he work two 5-hour shifts per week and Timesheet 2 contains data for an employee whose schedule determines that she work five 12-hour shifts per week. In his incorrectly computed point estimate of the average number of hours worked per day, Mr. Sturgeon would count the 5-hour shift twice and the 12-hour shift five times. His calculation implies he has seven total independent, uncorrelated observations when in reality all his observations except two are correlated with the other observations. In contrast, the panel on the right shows an illustrative example of a random and independently drawn 7-item sample, where the level of data is the workday – not timesheet.

| | | Example of the Point Estimate Calculation | | | | | |
|---|---|---|---|---|---|---|---|
| | | Mr. Sturgeon's Method | | | Random Method | | |
| Obs. | Timesheet | Workday | Hours Worked | Timesheet | Workday | Hours Worked | |
| 1 | Timesheet 1 | Day 1 | 5.0 | Timesheet 1 | Day 1 | 5.0 | |
| 2 | Timesheet 1 | Day 2 | 5.0 | Timesheet 2 | Day 2 | 12.0 | |
| 3 | Timesheet 2 | Day 1 | 12.0 | Timesheet 2,789 | Day 3 | 10.5 | |
| 4 | Timesheet 2 | Day 2 | 12.0 | Timesheet 15 | Day 6 | 4.5 | |
| 5 | Timesheet 2 | Day 3 | 12.0 | Timesheet 627 | Day 4 | 3.5 | |
| 6 | Timesheet 2 | Day 4 | 12.0 | Timesheet 18,001 | Day 2 | 10.5 | |
| 7 | Timesheet 2 | Day 5 | 12.0 | Timesheet 727 | Day 1 | 7.0 | |
| | | | | | | | |
| | Average per Day: | | 10.0 | | Average per Day: | 7.6 | |

22.     Overall, using the actual figures, Mr. Sturgeon implies that his sample size is 418, though it only consists of 100 observations that are not correlated with the other 318 observations. He claims, using the 418 observations, that the potential class members worked 9.14 hours per day, on average,[16] but we do not know what the average (or median) would be had Mr. Sturgeon correctly selected random, independent, and uncorrelated observations at the daily level.[17]

**B.      Mr. Sturgeon's Sample Suffers from Measurement Bias**

23.     Second, Mr. Sturgeon's sample suffers from measurement bias in that it systematically ignores portions of the population.[18] I understand from counsel for Plaintiff that Mr. Sturgeon's sample includes 25 timesheets each from the four years, 2016, 2017, 2018, and 2019, for a total of 100 timesheets. He ignores all timesheets from the year 2015, even though he had access to those records according to his Declaration.[19]

---

[16] As mentioned in footnote 14 above, the median could be a better indicator of the typical shift length since the mean (or average) can be affected by outliers, especially in this situation where Mr. Sturgeon is working with a small sample size. Mr. Sturgeon does not report a median in his Declaration.

[17] The correlation of the observations in his sample is additionally problematic, as will be described below, as his sample does not meet the condition of inference with respect to independence and therefore can cannot be used to generalize about the population.

[18] Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition), p. 335.

[19] He ignored 20 weeks in the 213-week period he purports to have analyzed, from August 14, 2015 to September 6, 2019 (Supplemental Sturgeon Declaration, ¶7). The Class Period spans August 14, 2015 to the present, inclusive.

Furthermore, I understand from counsel for Plaintiff that his sample covers 83 of the 1,016 potential Class Members that he identified. It is unknown whether his selection methodology was properly stratified so as to adequately represent Trillium's various clients as Mr. Sturgeon does not provide the relevant methodological information in his Declaration. In any event, based only on his exclusion of 2015 data, his sample suffers from measurement bias, and any statistic calculated from his sample, as presented in his Declaration, is inadequate to draw reliable generalizations about the Class.[20]

### C.  Mr. Sturgeon's Sample Fails to Meet the Conditions for Inference as the Observations are Not Independent and Random

24.  Third, his sample fails to meet the conditions for inference, in that the observations are not independent and random.[21] He provides no evidence that the sample of 100 timesheets that he relied upon was in fact randomly selected other than to state: "I had staff gather and review a random sample of 100 time sheets from potential class members during the potential class period." He provides no methodological information in his Declaration about how this was done. For example, *What tool did his staff use to randomize the population before making their selections? What decisions (other than incorrectly omitting 2015 timesheets from the sample) were made to establish that the random selection would be adequately representative?* One indication that the sample was not randomly selected is that it omits the first portion of the Class Period, as mentioned above. If truly random, the sample would have been drawn impartially from the data across the analyzed time period.[22] In addition, as mentioned

---

[20] This effect would be particularly pronounced if Trillium's business differed in 2015 from the other years in the analysis window (e.g., if there is a different mix of clients, varying level of economic activity, etc.).

[21] *See* Wooldridge, Jeffrey M. *Introductory Econometrics: A Modern Approach* (Fifth Edition), pp. 755-756. *See also*, Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition), p. 339.

[22] Of the 213-week window Mr. Sturgeon analyzed, 20 weeks (9.4%) occurred in 2015. Out of 100 draws, with replacement, the chance of *not* choosing a timesheet from 2015 as part of a random process is 1 out of 19,153. In addition, the fact that his sample includes 83 out of the 1,016 potential class members indicates that there are 17 repeats in his 100 draws. It is unclear from the Supplemental Sturgeon Declaration and without having access to the underlying data what the likelihood of this outcome would be if his 100 draws were in fact random.

in Section VII.A above, because Mr. Sturgeon relies on 418 daily records drawn from 100 timesheets, his sample is correlated and not independent and fails to meet the independence condition for inference about the population. As a result of these flaws, any statistic calculated from his sample, as presented in his Declaration, is inadequate to draw reliable generalizations about the Class.

**D.      Mr. Sturgeon's Average Shift Length Statistic Is Unreliable and The Precision of His Statistic Cannot Be Calculated Due to the Numerous Flaws in his Statistical Sampling Analysis**

25.      As described above, his sample is not random, independent, or representative of the population. Based on these issues, the sample and resulting point estimate statistic – i.e., that the average workday is 9.14 hours in length – is unreliable and would yield unreliable results with an unknown error rate in a damages analysis. Notably, Mr. Sturgeon does not provide standard errors or a confidence interval for his statistic. Standard errors are critically important in statistical sampling in that they allow one to compute the margin of error of the sample statistic at a given level of confidence. Even if he had wanted to calculate standard errors or a margin of error at a particular confidence level, it is impossible for him to do so in a way that is statistically sound due to the flaws in his sampling methodology.

26.      The standard error of the mean from a sample is equal to the standard deviation of the measure from the sample divided by the square root of the sample size, expressed with the following formula:

$$SE = \frac{\sigma}{\sqrt{n}}$$

27.      Mr. Sturgeon's sample is not representative, random, or independent, thus, like his point estimate statistic, a standard error computed from his flawed sample based upon this formula also would be unreliable.[23]

---

[23] Technically, it is possible for Mr. Sturgeon to have attempted to calculate something referred to in statistics as "robust standard errors," to address the non-independence of his observations. Although,

28.     The Court has no way of knowing the accuracy of his 9.14 hours estimate, or the range of possible outcomes from his analysis at any level of precision, and Mr. Sturgeon has no way of presenting such information for the sample described in the Supplemental Sturgeon Declaration in a way that is statistically sound. Thus, his point estimate of 9.14 hours per day cannot be used to generalize about the Class and would yield unreliable results with an unknown error rate in a damages analysis.

## VIII. Even if Mr. Sturgeon Corrected the Statistical Issues Outlined Above, His Chosen Sample Size Alone May Lack the Statistical Power Needed To Draw Reliable Inferences About the Class

29.     Mr. Sturgeon estimates that there are approximately 100,000 daily time records in the population.[24] Let us assume for illustrative purposes for this section of my Declaration that this number is accurate. Even if his sample did not suffer from the statistical issues outlined above, Mr. Sturgeon's small sample size, which amounts to a maximum of 100 independent and uncorrelated daily time records, may lack the statistical power needed to draw reliable inferences about the Class.

30.     The table below shows generic minimum sample size guidelines for 90%, 95%, and 99% confidence levels, at 1%, 2.5% and 5% margins of error, for a simple random sample for various population sizes. For a population of 100,000, at 95% confidence with a +/- 5% margin of error, for example, one would need approximately 383 randomly selected and independent daily time records. If one wanted even greater

---

that would require a more sophisticated and complex formula and interpretation, and there is no reason to go to such lengths in this case when the sample could have been constructed correctly and basic standard errors could have been computed. Regardless, even if he did compute robust standard errors to work around his independence issue, his sample is not random and representative and therefore any standard error calculated from the observations in his sample, had he calculated one at all, would be unreliable.

[24] "Therefore, to calculate the number of workdays, we took the total number of hours worked (865,286.40 hours) and divided this by the average number of hours worked per day from our review of the random sample of time sheets (9.14 hours). This amounted to 94,670.3 workdays." (Supplemental Sturgeon Declaration, ¶9).

precision in one's point estimate, say a +/- 1% margin of error, then one would need 8,763 randomly selected and independent daily time records.[25]

| Population Size (in this case, daily time records) | Confidence Level=90% Margin of Error | | | Confidence Level=95% Margin of Error | | | Confidence Level=99% Margin of Error | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1.0% | 2.5% | 5.0% | 1.0% | 2.5% | 5.0% | 1.0% | 2.5% | 5.0% |
| 100 | 99 | 92 | 74 | 99 | 94 | 80 | 100 | 97 | 88 |
| 1,000 | 872 | 521 | 214 | 906 | 607 | 278 | 944 | 727 | 400 |
| 10,000 | 4,036 | 977 | 264 | 4,900 | 1,333 | 370 | 6,240 | 2,098 | 623 |
| 100,000 | 6,337 | 1,071 | 270 | 8,763 | 1,514 | 383 | 14,230 | 2,586 | 660 |
| 1,000,000 | 6,720 | 1,082 | 271 | 9,513 | 1,535 | 385 | 16,319 | 2,648 | 664 |

31.     As mentioned in Section VII.A, there are 100 independent, uncorrelated daily time records in Mr. Sturgeon's sample. Even if he were to correct all the problems in his sample construction, but keep his sample size fixed at 100, his sample may lack the statistical power needed to draw reliable inferences about the Class, depending on the application and level of precision needed for that application. The level of precision for the sample statistic would be expressed in terms of the margin of error for a chosen confidence level. To note, the statistical flaws in Mr. Sturgeon's sample cannot be solved simply by enlarging the sample size alone while keeping his selection methodology the same.[26]

## IX.   Conclusion

32.     Based on a careful review of his methodology, and for the reasons outlined above, I have determined that the sample and the statistic that Mr. Sturgeon calculates from that sample (i.e., the average number of hours worked per day) are not statistically valid and, therefore, would yield unreliable results with an unknown error

---

[25] The table provides guidelines. In an actual statistical sampling analysis, the statistician would calculate the standard errors and margins of error for a particular confidence level using the observations in the sample.

[26] Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition), p. 335. "When a selection procedure is biased, taking a large sample does not help. This just repeats the basic mistake on a larger scale."

rate in a damages analysis. Furthermore, even if Mr. Sturgeon were to correct the statistical errors in his sampling methodology, Mr. Sturgeon's sample size alone may lack the statistical power needed to draw reliable inferences about the Class.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 11th day of March, 2021, in Chicago, Illinois.

_____

Candice L. Rosevear

# Appendix A

# Documents Considered

**Court Documents**

- Notice by Defendant Midwest Construction Services, Inc. DBA Trillium Construction/Drivers of Removal of Civil Action to United States District Court, *In re BRYANT PATTON, individually and on behalf of all others similarly situated, v. MIDWEST CONSTRUCTION SERVICES, INC. DBA TRILLIUM CONSTRUCTION/DRIVERS, a California corporation, DOES 1 through 100, inclusive*, filed October 4, 2019.
- Declaration of Timm Sturgeon in Support of Midwest Construction Services, Inc. DBA Trillium Construction/Drivers's Notice of Removal of Civil Action to United States District Court, *In re BRYANT PATTON, individually and on behalf of all others similarly situated, v. MIDWEST CONSTRUCTION SERVICES, INC. DBA TRILLIUM CONSTRUCTION/DRIVERS, a California corporation, DOES 1 through 100, inclusive*, filed October 4, 2019.
- First Amended Class Action Complaint, *In re BRYANT PATTON, individually and on behalf of all others similarly situated, v. MIDWEST CONSTRUCTION SERVICES, INC. DBA TRILLIUM CONSTRUCTION/DRIVERS, a California corporation, DOES 1 through 100, inclusive*, filed December 11, 2019.
- Declaration of Timm Sturgeon in Support of Midwest Construction Services, Inc. DBA Trillium Construction/Drivers's Opposition to Motion to Remand, *In re BRYANT PATTON, individually and on behalf of all others similarly situated, v. MIDWEST CONSTRUCTION SERVICES, INC. DBA TRILLIUM CONSTRUCTION/DRIVERS, a California corporation, DOES 1 through 100, inclusive*, filed February 1, 2021.

**Textbooks**

- Freedman, David, Robert Pisani, and Roger Purves. *Statistics* (Fourth Edition).
- Wooldridge, Jeffrey M. *Introductory Econometrics: A Modern Approach* (Fifth Edition).

# APPENDIX B

# CANDICE L. ROSEVEAR

140 S. Dearborn, Suite 1000
Chicago, IL  60603
Office:   (312) 470-6512
Mobile:  (312) 622-6757
E-mail:   crosevear@globaleconomicsgroup.com

## EMPLOYMENT

**Global Economics Group, LLC**

> Principal (2021-Present)
> Vice President (2016-2021)
> Director (2012-2016)

**Chicago Partners, LLC (presently Navigant Economics)**

> Managing Consultant (2008-2011)
> Associate (2007-2008)
> Research Analyst (2006-2007)

## EDUCATION

**M.B.A.**  **University of Chicago Booth School of Business, 2012**
Master of Business Administration with a concentration in Economics, Finance, and Econometrics and Statistics

Teaching Assistant for Microeconomics in the MBA Program

**B.S.**  **Indiana University Kelley School of Business (Indianapolis), 2006**
Bachelor of Science, *magna cum laude*, in Business
Minor in Philosophy

Honors thesis: *The Legal and Ethical Implications of Radio Frequency Identification (RFID) Technology*; I presented my research at business law conferences in San Francisco and Indianapolis; research was published by American Business Law Journal (2009) and Organizational Dynamics (2007)

Beijing Foreign Studies University - Beijing, China, 2005

Appendix B - Candice L. Rosevear
Page 2

## TESTIMONIAL EXPERIENCE AND EXPERT REPORTS

**Windham et al and Marquez et al v. Golden Queen Mining Company, LLC**
Superior Court of the State of California, For the County of Kern, Metropolitan Division
Case No. BCV-18-102304/ BCV-19-102651
Declaration of Candice L. Rosevear, October 27, 2020

**Windham et al and Marquez et al v. Golden Queen Mining Company, LLC**
Superior Court of the State of California, For the County of Kern, Metropolitan Division
Case No. BCV-18-102304/ BCV-19-102651
Declaration of Candice L. Rosevear, October 20, 2020

**Claudia Barraza et al v. The Ritz-Carlton Hotel Company**
Superior Court of the State of California, County of Orange
JCCP Case No. 4652
Declaration of Candice L. Rosevear, May 8, 2020

**Laura Cota Olivas et al v. Peoplease, LLC et al**
Superior Court of the State of California, County of Los Angeles
Case No. BC605055
Expert Report of Candice L. Rosevear, October 29, 2019

**David Kohl v. Trans High Corporation**
Supreme Court of the State of New York
Index No. 655200/2016
Expert Report of Candice L. Rosevear, June 14, 2019

**Marc Kramer et al v. American Bank and Trust Company et al**
United States District Court, Northern District of Illinois, Eastern Division
Case No. 11-CV-08758
Expert Report of Candice L. Rosevear, June 12, 2019

**Gerardo Ortega et al v. J.B. Hunt Transport, Inc.**
United States District Court, Central District of California, Western Division
Case No. 2:07-CV-08336-RGK-AFM
Expert Report of Candice L. Rosevear, August 29, 2018

**Gerardo Ortega et al v. J.B. Hunt Transport, Inc.**
United States District Court, Central District of California, Western Division
Case No. 2:07-CV-08336-RGK-AFM
Expert Report of Candice L. Rosevear, August 15, 2018

**Gerardo Ortega et al v. J.B. Hunt Transport, Inc.**
United States District Court, Central District of California, Western Division
Case No. 2:07-CV-08336-FMC-JCx
Expert Report of Brendan P. Burke and Candice L. Rosevear, August 3, 2018

**Gerardo Ortega et al v. J.B. Hunt Transport, Inc.**
United States District Court, Central District of California, Western Division
Case No. 2:07-CV-08336-FMC-JCx
Declaration of Brendan P. Burke and Candice L. Rosevear, July 9, 2018

**EXPERT CONSULTING EXPERIENCE**

- **Employment Matters**
  - Served as an expert economist and expert consultant for various confidential wage and hour matters, including FLSA class actions and PAGA representative actions, in which I analyzed human resource data, timecard data, building access data and driving distance data to estimate liability, penalties and damages.

  - Served as an expert consultant for various confidential employment discrimination matters, including disparate impact class action litigation, in which I developed logistic and multivariate linear regression models to quantify the effects of candidate and employee characteristics on hiring, promotion, salary growth and reductions in force.

- **Securities Fraud Matters**
  - Served as an expert consultant for the economic analyses for various class action securities fraud matters, in which I assessed market efficiency, established loss causation and calculated class-wide damages.

  - Consulted a prominent mediator on class action securities fraud matters.

  - Developed various financial models to analyze volatility and pricing behavior for a wide range of securities in a wide range of markets, applying, for example, market models, intraday event studies, GARCH models and statistical tests for structural breaks.

- **Valuation Matters**
  - Served as an expert economist in the valuation of an executive's employment contract.

  - Served as an expert consultant for a medical malpractice dispute involving the valuation of compensatory damages.

  - Analyzed liability and damages in various LIBOR-related manipulation matters, in which I conducted the valuation of financial instruments including swaps, options and other financially engineered products, applying, for example, Black-Scholes, binomial trees and Monte Carlo methods.

  - Developed a process to estimate the economic value of park district assets as part of a *pro bono* consulting engagement with the Chicago Park District and the Office of the Mayor. The process includes geospatial analysis of GIS data and

hedonic price modeling, as well as traditional valuation methods such as
discounted cash flow.

- **Other**
  - Developed empirical analyses and market manipulation screens to address claims
    involving cartel behavior, price-fixing and bid-rigging in various confidential
    market manipulation matters.

  - Conducted market concentration and impact analysis for a national health food
    chain as part of merger and acquisition antitrust matter.

  - Built, managed and analyzed large and complex multi-dimensional databases on
    high profile cases, including the AMD v. Intel antitrust litigation.

  - Extensive experience designing financial models and executing other
    econometric and statistical procedures in SAS, Stata, Python and R software.

## SELECT SPEAKING ENGAGEMENTS AND STUDIES

Invited Panelist, "Loss Causation in a Bear Market: The Economists' Perspective," The
Chicago Bar Association, June 30, 2020.

Author, "Diversity of Asset Managers in Philanthropy: A Study to Assess the
Representation of Women and Racial or Ethnic Minorities among Investment Firms Used
by the Country's Top 50 Charitable Foundations," The John S. and James L. Knight
Foundation, February 2020.

Invited Panelist, "Industry Leaders in Analytics," The University of Chicago Booth School
of Business, November 9, 2019.

Co-Author, "The Power of Parks: An Assessment of Chicago Parks' Economic Impact,"
The Chicago Park District, July 2014.

## COMMUNITY, AFFILIATIONS AND AWARDS

- Board of Directors, Old Town School of Folk Music, 2019-Present
- Beta Gamma Sigma Academic Honor Society
- Kelley School of Business Director's Advisory Board, 2004-2006
- Kelley School of Business Dean Selection Committee, 2004-2005
- NCAA Student Athletic Advisory Committee, 2003
- J. Dwight Peterson Key Award: awarded annually to the top business student, 2005